## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

**EDIN KARAHODZIC and
EDIN KARAHODZIC, as
Personal representative of the
Estate of HASIB KARAHODZIC**

       **Plaintiffs,**

**vs.**

**JBS CARRIERS INC. and ORENTIO**      **Case No. 12-cv-1040-DRH**
**THOMPSON,**

       **Defendants.**

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

### I.    INTRODUCTION and BACKGROUND

Now before the Court are plaintiffs' motions to exclude the testimony and report of defendants' experts Dr. Stacey Smith (Doc. 75), John Goebelbecker (Doc. 87), and Dennis Wylie (Doc. 90). Also, before the Court are defendants' motions to exclude plaintiffs' experts Karen Grossman Tabak, Ph.D., C.P.A. (Doc. 77) and Mark Ezra, P.E. (Doc. 84), in addition to seeking exclusion of certain opinions and expert reports put forth by William E. Hampton, Mark Ezra, P.E. and Fred B. Semke, P.E. (Doc. 79). For the following reasons, the motions are GRANTED in part and DENIED in part.

On March 17, 2012, defendant Orenthio Thompson, an employee of JBS Carriers, Inc., was transporting a load of goods via I-70 in Illinois in a tractor-trailer traveling. During this transport route, Thompson's vehicle pulled on to the shoulder of I-70 near the exit for Brownstown, Illinois to inspect his trailer lights. Thompson then drove his vehicle back onto westbound I-70 into the right-hand lane.  Thereafter, a collision occurred between Thompson's tractor-trailer and a tractor-trailer driven by Hasib Karahodzic. Shortly after the collision occurred, Hasib's tractor caught fire at some point around this time. Karahodzic did not survive.

Following the collision, JBS Carriers filed a lawsuit in this court on September 27, 2012. Thereafter, Edin Karahodzic, as personal representative of the Estate of Hasib Karahodzic and EJA Trucking, Inc. filed a counterclaim (Doc. 11). Edin Karahodzic, individually, also filed a third party complaint (Doc. 22). Currently at issue are the expert witnesses put forth by the parties in this case. The parties challenge the expert witnesses and/or their expert reports under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), which the Court will address below.

## II.   LEGAL STANDARD

FEDERAL RULE OF EVIDENCE 702, and in particular *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), govern the admissibility of expert testimony. The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise.  *Smith v. Ford Motor Co.,*

215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. *Daubert* clarified Rule 702 charges the district court with the task of ensuring expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589.

Courts in the Seventh Circuit conduct a three-step analysis under *Daubert*. *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).[1] First, the district court must determine whether the person whose testimony is offered is in fact an expert, as codified in Rule 702 through "knowledge, skill, experience, training, or education." *Id.* (citing Fed.R.Evid. 702). Notably, although "extensive academic and practical expertise" sufficiently qualify a potential witness as an expert, *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). *Smith*, 215 F.3d at 718 (citing *Kumho*, 526 U.S. at 156 ("[N]o one denies

---

[1] The Court notes the Seventh Circuit has also described the *Daubert* analysis as a two-step process. *See Chapman v. Maytag Corp.,* 297 F.3d 682, 686 (7th Cir. 2002). However, as *Chapman* simply combines the first two steps described in *Ervin* as a single test of reliability, whether the analysis is described as a three-step or two-step process does not substantively change the Court's analysis.

that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")).

Secondly, the district court must determine the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; *see Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho*, 526 U.S. at 147). Specifically, the testimony must have a reliable basis in the knowledge and experience of the relevant discipline, *Kumho*, 526 U.S. at 149 (internal quotations removed), consisting in more than subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Daubert*, 509 U.S. at 590.

Further, as to reliability, *Daubert* provided the following non-exhaustive list of relevant factors: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 593-94).

Nonetheless, there is no requirement that courts rely on each factor, as the gatekeeping inquiry is flexible and must be "tied to the facts" of the particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591); *see also Chapman*, 297 F.3d at 687. Thus, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his [or her] conclusions." *Smith*, 215 F.3d at 718 (citing *Kumho,* 526 U.S. at 153).

The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). Accordingly, the court's gatekeeping function requires focus on the expert's methodology; "[s]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595; *Walker*, 208 F.3d at 587).

Resolution of an expert's credibility or the correctness of his or her theories is left to the jury's determination after opposing counsel has cross-examined the expert at issue. *Id.* (citing *Walker*, 208 F.3d at 589-90). Thus, "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.* (citing *Kumho*, 526 U.S. at 159 (Scalia, J., concurring) (stating that the trial court's function under *Daubert* is to exercise its discretion "to choose among reasonable means of excluding expertise that is *fausse* and science that is junky")). However, as an expert must explain the methodologies and principles that support his or her opinion, he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)).

Lastly, the district court must consider whether the proposed testimony will assist the trier of fact in its analysis of any issue relevant to the dispute. *See Smith*, 215 F.3d at 718; *Chapman*, 297 F.3d at 687; *Daubert*, 509 U.S. at 592. It is crucial that the expert "testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.'" *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.,* 157 F.3d 512, 519 (7th Cir. 1998)). However, the expert need not have an opinion as to the ultimate issue requiring resolution to satisfy this condition. *Smith,* 215 F.3d at 718 (citing *Walker*, 208 F.3d at 587). Based on the legal standard set forth above, the Court now turns to the individual experts' testimony challenged in this case.

## III.   ANALYSIS

### 1. Dr. Stacey Smith

Plaintiff argues that the report and testimony of Dr. Stacey Smith, a board certified psychiatrist, must be excluded based on the invalidity of a Minnesota Multiphasic Personality Inventory (MMPI) study administered to Esma Karahodzic (Doc. 75). Specifically, plaintiff seeks exclusion of Dr. Smith's testimony referencing her evaluation of Esma Karahodzic and Esma Karahodzic's MMPI test. Dr. Stacey administered a MMPI test to Esma, the wife of the late Hasib Karahodzic, following Mr. Karahodzic's death. Plaintiffs do not challenge Smith's qualifications as an expert, but rather question her the methodology and validity of the results due to the fact that Esma Karahodzic did not speak English, and

she only attained an elementary level Bosnian education at the time the test was ordered.

Dr. Smith testified in her deposition that she administed the MMPI test to Esma, and then sought out Dr. Wetzel to decipher the results. Plaintiff argues that Smith was made aware that the MMPI test was not appropriate for non-English speaking people, that she administered the test despite that knowledge and that she utilized those results for her analysis of Esma (Doc. 76-1. p. 45). Ultimately plaintiff argues that although the MMPI, which is a scientifically valid test that allows for scores on certain scales of the MMPI to be used in the diagnoses of certain psychiatric disorders, here, Dr. Smith relied on a test which is inappropriate to administer to Mrs. Karahodzic under the circumstances. Specifically, the language barrier raises questions of validity, as the MMPI is an inappropriate test for a non-English speaking person, such as Esma Karahodzic (Doc. 76).

Defendants respond by asserting that Dr. Smith's reference to the MMPI in her report constituted only a small portion of "lengthy 31 page analysis of Esma," and it remains separate from her overall diagnostic impressions (Doc. 102). However, Dr. Smith's own words note that the MMPI testing was taken into consideration in forming her medical/scientific opinion, despite the invalidity of the MMPI test on a non-english speaker (Doc. 76-1, p.45). JBS Carriers, while acknowledging the invalidity of the MMPI, argues that the test proved significant, nevertheless. Dr. Smith reported that Esma gave responses indicating that she

had numerous psychiatric problems, resulting in more complaints than those made by active psychotic inpatients (Doc. 76-1, p. 45).

Notably, Dr. Wetzel, the expert hired to examine and score Mrs. Karahodzic's MMPI, discussed with Dr. Smith that the MMPI test would be inappropriate for a non-english speaking person because of the inherently invalid results. However, Dr. Smith went ahead with administering the test (Doc. 76-1, p. 45). Following the MMPI Dr. Wetzel also noted the issues with Mrs. Karahodzic's MMPI and cautioned Dr. Smith from relying on them to provide a valid indication of symptoms and personality traits. He specifically stated that "the interpreter is cautioned against making clinical administrative decisions on the basis of this MMPI-2 protocol without determining the reasons for the extreme responding." (Doc. 81, p. 9).   Dr. Wetzel's comments further exhibit that Dr. Smith's methodology is an not accepted industry procedure.

Defendants did not dispute that Mrs. Karahodzic was Bosnian, possessed only a Bosnians elementary level education, or that her test results were invalid (Doc. 102). However, defendants failed to adequately respond to plaintiffs' argument attacking Smith's methodology. Defendants failed to provide the court with the report or any deposition excerpts in support of their argument that the MMPI test was a separate and distinct from the conclusions in Dr. Smith's report, and that her conclusions are not borne out by language in the report. Plaintiff, however, did provide deposition testimony of Dr. Smith for the court's review, allowing for an examination of defendants' argument. Upon review of Dr. Smith's

testimony, it is unclear from reading the report what bearing the inappropriate test had on the conclusions of the expert.

Once a party calls into question the qualification under *Daubert*, it is the party supporting that expert who carries the burden of persuasion to convince the court that said expert is qualified. Fed.R.Evid. 702 advisory committee's note 2000 Amend.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); See also *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

Based on this evidence and the fact that defendant bears the burden of persuasion to support their proffered expert in this instance, the testimony of Dr. Stacey Smith will be disallowed.

**2.  Karen Grossman Tabak, Ph.D., C.P.A.**

Defendants move to exclude Karen Grossman Tabak, Ph.D., C.P.A., the Economist who put forth by plaintiff to opine, from an economic damages perspective, on Esma Karahodzic's lost earnings resulting from effects suffered following the death of her husband, Hasib (Doc. 78).  Defendants do not challenge Tabak's qualifications as an expert, or her methodology as an economist, but rather the appropriateness of Tabak's testimony and report about Esma Karahodzic's lost wages, as a potential basis for recovery, since Mrs. Karahodzic

is not a party to this action. Plaintiffs respond arguing that Esma Karahodzic's lost wages qualify as pecuniary losses subsequent to the "grief, sorrow and mental suffering" associated with losing a spouse, which plaintiff argues are accounted for under the Illinois' Wrongful Death Act.

The Illinois Wrongful Death Act (hereinafter "the Act") specifically states:

> "§ 2. Every such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person. *In every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person.*
>
> The amount recovered in any such action shall be distributed by the court in which the cause is heard or, in the case of an agreed settlement, by the circuit court, to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person."

740 ILL. COMP. STAT. ANN. 180/2. (emphasis added). The Illinois Wrongful Death Act allows a decedent's spouse and next of kin to recover damages for the injuries from a wrongful death. In the interest of judicial efficiency, the Wrongful Death Act also requires that a single action be brought on behalf of a decedent's surviving spouse and next of kin to the extent that they incur injury recognized by the Act. Illinois expanded available damages under the Act in 2007 to allow recovery for "grief, sorrow, and mental suffering" experienced by a decedent's spouse and next

of kin following his death. See H.B. 1789, 95th Gen. Assemb., Reg. Sess. (Ill. 2007).

The Act is intended to provide the surviving spouse and next of kin with benefits that they would have received from the continued life of the decedent. The expansion of the damages recovery language mentioned above expresses an intent on the part of Illinois' legislature to include recovery for the emotional effects suffered by a decedent's dependents, as distinguished from a loss of companionship award, which was already recoverable under the Act prior to the 2007 amendment.

"The Act specifies that damages are given as the jury deems to be "fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering." 740 Ill. Comp. Stat. 180/2. Thus, the grief, sorrow, and mental suffering are compensable only insofar as they are injuries stemming from the wrongful death". *Hammond v. Sys. Transp., Inc.*, 942 F. Supp. 2d 867, 871-72 (C.D. Ill. 2013)(includes statutory construction of the terms "grief, sorrow, and mental suffering.").

In this case, plaintiff argues that Hasib's unexpected death affected his wife, Esma, in such a way that she experienced compensable grief and mental suffering affecting her ability to work. Specifically, plaintiff claims that Esma's inability to work is due to the alleged psychiatric problems from which she suffers following her husband's death. Plaintiffs argue the relevance of Grossman's report illustrates a widow damaged by loss of earning capacity, flowing from the death of

her husband. However, defendant argues that a putting forth Karen Grossman Tabak's report goes beyond the scope of recoverable damages (Doc.77).

"The evaluation of the loss in a wrongful-death action cannot be made in a vacuum but, rather, must include an understanding of the relationships among all of the family members." See Hunter et al., *Trial Handbook for Illinois Lawyers, Civil* § 69:49 (8th ed 2014). When assessing damages under Illinois law a jury may consider "how long the [ ]widow and/or next of kin will be likely to sustain pecuniary losses as a result of decedent's [ ] death, considering how long decedent [ ] was likely to have lived and how long [ ] widow and/or next of kin [is] [are] likely to live." See Ill. Pattern Jury Instr. Civ. 31.03.

Because the "grief, sorrow, and mental suffering" experienced by a spouse or other next of kin is relevant to the question of pecuniary loss, and plaintiff asserts that the illness flowing from her husband's death ultimately prevents Esma from working, defendants' motion to exclude the expert report and testimony of Karen Grossman Tabak is denied. Whether Esma's injuries did in fact flow from her husband's death and whether the jury then chooses to award damages for that mental suffering remain issues for the jury.

### 3. Expert Reports—Hampton, Ezra and Semke's

With regard to accident reconstructionists William E. Hampton, Mark A. M. Ezra, P.E, and Fred B. Semke, P.E, defendants seek to exclude certain portions of each individual's report (Doc. 82). Specifically, defendants move to exclude all portions of each report referring to alleged violations of Illinois Compiled statutes.

Each expert's report references or alludes to Illinois' statutes governing merging traffic (625 ILCS 5/11-905) and minimum speed regulations (625 ILCS 5/11-606) in the process of reconstructing the accident or in relation to Thompson's driving on the date in question.

Defendants do not challenge Hampton, Ezra[2], or Semke qualifications, scientific validity, or relevancy under *Daubert*. Instead, defendants allege that expert's opinions that reference statutory compliance, or lack thereof, amounts to impermissible legal conclusions (Doc. 83). Defendants also seek exclusion of two of the three expert opinions arguing that the evidence presented by the experts is cumulative and prejudicial under Federal Rule of Evidence 403.

Expert testimony must be relevant and based on "sufficient facts or data." *Stollings v. Ryobi Technologies, Inc.,* 725 F.3d 753, 765 (7th Cir.2013). The purpose of expert testimony is to help the jury "with technical issues that laypeople would have difficulty resolving on their own." *Stollings,* 725 F.3d at 765; Fed.R.Evid. 702. Notwithstanding the fact that an expert may opine on an issue of fact within the province of the jury, expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible. Fed. R. Evid. 704; *RLJCS Enterprises, Inc. v. Professional Ben. Trust Multiple Employer Welfare Ben. Plan and Trust,* 487 F.3d 494, 498 (7th Cir. 2007); *Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir.2003).

---

[2] Defendants' motion challenging Mark Ezra under *Daubert* will be addressed in the following section. Currently, the court reviews the expert reports under defendants' challenge as to certain portions of each individual's report.

Seventh Circuit precedent specifies that experts may not offer opinion testimony as to whether a defendant violated a statute or regulation at issue in a case. See *Good Shepard*, 323 F.3d at 564 (held expert testimony that included "conclusions that the [defendants] violated the [Fair Housing Amendments Act]" was properly excluded); *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir.2008) (the meaning of a statute is "a subject for the court, not for testimonial experts"); *United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir.1996); *McCabe v. Crawford & Co.*, 272 F.Supp.2d 736, 740 (N.D.Ill.2003) (holding that a law professor who specialized in consumer law, "may not expound on what complies and does not comply with the [Fair Debt Collection Practices Act]" because the testimony would be considered "inappropriate legal conclusions"); *Cent. Die Casting and Mfg. Co., Inc. v. Tokheim Corp.*, No. 93–7692, 1998 WL 812558, at *9 (N.D.Ill. Nov.19, 1998) ("The Court agrees that an expert's opinion concerning whether a statute or regulation was violated is likely an inadmissible legal conclusion…").

"The only legal expert in a federal courtroom is the judge. Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory." *United States v. Lupton,* 620 F.3d 790, 800 (7th Cir.2010)(affirming exclusion of purported expert who was to explain how statute would apply). Accordingly, any testimony concerning whether Thompson violated the Illinois' statutes governing merging traffic (625 ILCS 5/11-905) and minimum speed regulations (625 ILCS 5/11-606) is improper.

The experts shall be permitted to offer testimony regarding the accident, driver conduct, and their conclusions in the descriptive sense to assist the trier of fact. However, the experts may not opine on whether defendants' actions violated Illinois' statutes governing merging traffic (625 ILCS 5/11-905) and minimum speed regulations (625 ILCS 5/11-606), as such opinions constitute legal conclusions.

As a secondary argument, defendants also contend that the expert reports and testimony discussing the aforementioned Illinois statutes should be excluded under FRE 403 for their cumulative and prejudicial significance. Plaintiffs may attack the witnesses' credibility on cross-examination or through the testimony of their own expert to contradict the proposed conclusions put forth by Hampton, Semke, and Ezra. Any alleged prejudice shall be eliminated through cross-examination and instructions to the jury that it is not required to accept the witnesses' conclusions as to the cause of the accident.

Accordingly, the court declines to exclude the testimony as cumulative at this time, but acknowledges that, should the matter become a problem at trial, defendants may renew its objection under Rule 403. However, as stated above, the expert's testimony must strictly conform with this Court's order and refrain from opining whether defendants' actions violated Illinois' statutes governing merging traffic (625 ILCS 5/11-905) and minimum speed regulations (625 ILCS 5/11-606).

### 4. Mark Ezra, P.E.

In addition to limiting expert reports, defendants move to exclude the testimony of Mark Ezra, P.E., an engineer prepared to offer testimony regarding contributing factors to the accident (Doc. 84). Specifically, defendants challenge the scientific reliability of certain conclusions Ezra reached in his report. The specific conclusions challenged are:

> "4. Mr. Thompson should have turned OFF his emergency flashers and used the turn signal to indicate his intention to merge into the right lane of traffic. The continued use of emergency flashers is confusing and/or misleading for other vehicles. A vehicle approaching the Thompson Vehicle would have to decipher whether a vehicle with emergency flashers turned on is merging into the right hand lane or leaving that lane to stop in the emergency lane.
>
> 6. Mr. Thompson's early merge into the right lane may have further caused confusion to Mr. Karahodzic as he would not have been able to determine whether Mr. Thompson was avoiding road debris before pulling off I-70 into the emergency lane.
>
> 7. The failure of Mr. Thompson to use his left turn signal to indicate his intention to pull into the right lane of travel from the emergency lane created a confusing situation for all drivers coming up on his truck from behind. (Doc. 85-1)."

Defendants argue that Mr. Ezra should not be permitted to offer testimony concerning the cause of the accident relating to Thompson's use of his emergency flashers, failure to use his turn signal, and his early merge, because Ezra's opinions are scientifically unreliable and not reasonably based on the facts of this

case.   Defendants argue that Ezra's opinions are instead based largely on speculation and assumptions.

Plaintiffs respond by asserting that Ezra, an engineer with over thirty years of experience, based his opinions on his experience and expertise as a mechanical engineer, board certified forensic engineer and accident reconstructionist (Doc. 99). Specifically, plaintiff discussed Ezra's work at Nouveau Depart where he performed "analysis and evaluation[s] of safety and reliability, hazard assessment of systems and structures, and accident reconstruction of motorcycle crashes and automobile crashes." (Doc. 99- 5) Plaintiffs argue that Ezra's exposure to accident cases greatly exceeds that of the average person because of his lengthy career as a forensic engineer and accident reconstructionist, and therefore he should be permitted to offer an expert opinion on Thompson's actions.

Based on Ezra's extensive experience, skill, and expertise working as a Forensic engineer in accident reconstruction and working directly related to issues highway safety, Ezra is qualified as an engineering and accident reconstructionist Forensic Engineering Analysis of Trailer Sway expert (Doc. 99- 5). Between 2010 and 2013 alone, Ezra testified as an accident reconstruction expert in seven cases. Additionally, he published peer-reviewed articles including "Forensic Engineering Analysis of Trailer Sway Accidents" in the *National Academy of Forensic Engineers* and participated in the "Advanced Accident Re-Construction for Forensic Engineers Series Seminar" (*Id.*). Therefore, the court concludes that Ezra possesses the necessary "knowledge, skill, experience,

training, or education" to qualify as an expert in accident reconstruction. Fed.R.Evid. 702.

Having determined that Ezra is a qualified expert in this case, the court now turns to review the scientific reliability and relevance of his methodology. As mentioned above, Rule 702 specifically allows for the admission of expert testimony where the expertise and knowledge is based on that person's experience. *Walker*, 208 F.3d at 591. Additionally, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience," which plaintiff argues Ezra did in this case. *Smith*, 215 F.3d at 718 (citing *Kumho*, 526 U.S. at 156). Plaintiffs emphasize that Ezra's opinions and deposition testimony are based on facts learned during discovery through review of photos of the scene, deposition testimony, ERD vehicle data, and medical records, in addition to his scientific knowledge acquired over his lengthy career (Doc. 83-2).

With regard to Ezra's methodology and reasoning, the court must find that it is based on more than subjective belief and unsupported speculation. *Chapman,* 297 F.3d 682, 687 (7th Cir. 2002); *Daubert*, 509 U.S. at 590. During Ezra's ten years working at Nouveau Depart, he worked through the Highway Safety Institute and the Institute of Safety Analysis, Inc., while analyzing and assessing accident reconstruction of both for motorcycle and vehicular accidents (Doc.99-5). *Daubert's* gatekeeping function is necessary to "make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant he field." Id. at 152.

Here, Ezra stated in his deposition testimony that his report is based on facts learned during the discovery phase. He based his opinions on photographs of the scene, deposition testimony of Thompson, CORSIM heavy truck acceleration data, the accident report, and ERD and loading data from Thompson's vehicle (Doc. 99-7).  For example, in his deposition testimony, Ezra mentions relying on the loading data to help calculate momentum of the semi-truck (Doc 85-2, p.30-34).

Further, Ezra mentioned that the errors made by Mr. Thompson challenged by defendant help to illustrate for the reader, "a broader view of what we considered" (Doc. 85-2, p. 36).  During his deposition, Ezra mentioned that he and his team used physics and engineering principles, in addition to police photos and deposition testimony, to reconstruct the accident location and determine a speed range for the vehicles and factors of the accident (Doc. 85-2, p. 40-41, 66-69).

Ezra, as an expert witness, may base his opinions on inadmissible hearsay evidence, provided that the evidence is of the type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" Fed.R.Evid. 703. During his deposition, Ezra testified as to the basis for his challenged opinions rooted in his engineer background.

> "A: So from an engineering perspective, given the truck was
> functioning, meaning the engine was running, the gear  box was

working, everything was drivable, then  it is better and, in fact, good practice, but from an engineer  perspective, it would be to get off the highway.  It's not an emergency such as your wheel coming loose and falling off.

Q.    And I have to ask you, what is it in your engineering background, why is that an engineering opinion other than simply an accident expert opinion?  What engineering principles factor into that determination?

A.    My understanding of braking distances, brakes. Generally, the hazards. In other words, if you --since you asked me a slightly pedantic question, then my understanding of kinetic energy. Kinetic energy is the energy of motion and that goes with the square of the speed. Well, if you were to pull off on the exit ramp and move up to where people, even if they've exited, are going to be going a lot less than I think it is 65 miles an hour was the speed limit there, then the energy, if an impact should occur, will the available energy in any impact that might occur let's say at the top of the exit ramp where speeds would be much lower, maybe 30 miles an hour or 40 miles an hour, that energy goes down as the square of the reduction  in velocity. In other words, as a massive reduction in energy involved in any impact that  might occur and so what you're trying to do is put yourself in a place where, if you're hit, you're going to be hit with something that  has the least kinetic energy reasonably available. So that's the tie in, if you will, with practice. (Doc. 85-2, p. 41-42).

Ezra goes on to address the specific challenges of paragraph four pertaining to the use of emergency flashers in his testimony, where he indicates the basis for his opinion was rooted in engineering and the common practice of truck drivers in various situations. He discussed signaling noting that "it was built in there by engineers. What you've done with turning on emergency flashers is you're illuminating and then extinguishing and illuminating both signal lights that were placed there by engineers intentionally to signal following drivers what the vehicle was

doing. And by having both of them  on, you've lost, from  an engineering

perspective, you've lost the informational communication" (Doc. 85-2, p.

58). Additionally, he compared Thompson's actions to those of trucks

travelling across western states (Doc, 85-2, p. 59-60).

Ultimately, Ezra utilized a reliable methods common of accident

reconstruction that included inspection of the accident site, "measurements and

geometry" of the site, post-accident police photographs and his knowledge and

experience. The dispute as to what Karahodzic saw does not bar Ezra's, but goes

to weight of the evidence, and is appropriate for cross-examination. Ezra states he

relied in part on measurements and noted that "we have an idea of what

[Karahodzic] was able to see because, for example, Mr. Thompson has indicated

that after his checking all the lights were working, so Mr. Karahodzic was able to

see the trailer lights and the four-way flashers." (Doc. 85-2, p. 62).

When making a determination about whether Ezra's reasoning and

methodology were valid, the court also considers the expert's full range of

experience and training in the subject area. *Smith v. Ford Motor Co.*, 215 F.3d

713, 718 (7th Cir. 2000). "Unlike an ordinary witness, [ ], an expert is permitted

wide latitude to offer opinions, including those that are not based on firsthand

knowledge or observation. See Fed.R.Evid. 702 and 703. Presumably, this

relaxation of the usual requirement of firsthand knowledge [ ] is premised on an

assumption that the expert's opinion will have a reliable basis in the knowledge

and experience of his discipline." *Daubert*, 509 U.S. at 592.

In short, defendants' objections may affect the credibility of Ezra's opinions, but do not bar the testimony from the jury's consideration. Ultimately, Ezra utilized methods commonly relied on by accident reconstructionists that included deposition testimony, "measurements and geometry" of the site, post-accident police photographs and his knowledge and experience. The Court concludes defendants' criticisms of Ezra's inferences and conclusions are proper subjects for defendants' own expert testimony and for cross-examination before jury. *Daubert* instructed courts to not be concerned with reliability of the conclusions generated by valid methods and reasoning, but instead determine the validity of the principles and methodology underlying conclusions and inferences. *Winters v. Fru–Con, Inc.*, 498 F.3d 734, 742 (7th Cir.2007). If methodology and reasoning are valid then it logically follows that Ezra's inferences derived therefrom are valid. Therefore, the testimony will be admissible under Rule 702, so long as it is relevant.

Finally, regarding whether Ezra's testimony will assist the trier of fact in making their determination, his testimony and report offer an opinion relevant to the disputed facts that go to deciding the ultimate issue in this case. Ezra reviewed testimony, documents pertaining to the accident, photos of the accident scene, and ERD and loading data in the course of forming his opinion. Therefore, his testimony would aid the trier of fact in this case to determine the facts in issue. Accordingly, the court denies defendants' motion to exclude Mark Ezra's testimony.

### 5.  John Goebelbecker

Plaintiffs seek to exclude the expert testimony of John Goebelbecker, a mechanical engineer and professional accident reconstructionist put forth by the defense to render an opinion as an expert in accident reconstruction (Doc. 87). The first question for this Court is whether Goebelbecker is qualified to be an expert. Plaintiffs generally do not challenge Goebelbecker's qualifications, but instead challenge the scientific validity of his methodology and the report's incompleteness as to his conclusions. However, in their response, defendants maintain that "Goebelbecker is an accident reconstructionist with over twenty-five years of experience," who in addition to obtaining a graduate degree in Mechanical Engineering, attends various continuing education seminars regarding accident prevention and safety, maintains memberships in various professional societies, including the National Association of Professional Accident Reconstructionists, and publishes articles in periodicals such as *Accident Investigation Quarterly.* Therefore, the court concludes that Goebelbecker is, in fact, qualified, as he possesses the necessary "knowledge, skill, experience, training, or education" to qualify as an expert. Fed.R.Evid. 702.

Having determined that Goebelbecker is a qualified expert, the court now must determine whether his reasoning and methodology are reliable. Plaintiff first contends that Goebelbecker conclusions are based on numerous assumptions not based scientifically reliable data. First, plaintiff challenges the drag calculation created by Hasib Karahodzic's and Orentio Thompson's trucks after the collision,

Karahodzic's speed, and the conclusion that Karahodzic did not brake. Plaintiff argues that numbers, on which these calculations and conclusions are dependent, were chosen by merely plucking two numbers out of the air." (Doc. 88).

However, defendant highlighted that Goebelbecker's deposition testimony shows those numbers were based on a document from Daimler-Chrysler, the producer of the Freightliner driven by Mr. Karahodzic. Goebelbecker stated that "sixty-five to 75 is consistent with the physical evidence. Seventy-five was my top end because I respected the governed speed and that is indicated in the documentation from Daimler- Chrysler" (Doc. 104-4, p. 4)." The documents recorded that the ECM of the semi-truck was programmed with a maximum vehicle speed of 75 miles per hour, which Goebelbecker's relied on in his drag calculations and as a factor in to the speed calculations (in addition to the absences of skid marks). The court finds that Goebelbecker's opinion are relevant and based on reasonably reliable principles and methods because they are based on his investigation of the incident, as well as the knowledge he has obtained as a result of his training and many years of experience in accident reconstruction. [3]

Plaintiff also attacks the methodology and use of the lateral movement test performed by Dan Wiita, alleging that "its method is totally dissimilar from the facts of the case" (Doc. 88). Defendant argues that the lateral movement test was utilized to refute plaintiffs' theory that Thompson's truck "darted out" in from of

---

[3] Additionally, as defendants note, the methods that Goebelbecker relied on, and that plaintiffs criticized relating to approximate drag and speed calculations, are similar to those approximations made by plaintiffs' own expert.

Karahodvic's truck, leaving Karahodvic without time to brake. Defendants note that a large portion of Goebelbecker's opinion was based on his extensive experience in accident reconstruction (Doc. 104). Plaintiff discussed the weight discrepancy of the vehicle used in the study in great detail, which defendant argues is an appropriate topic for cross-examination, as it goes to the weight of the evidence not admissibility. The court agrees.

"If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."" *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 596.). Mr. Goebelbecker's twenty-five years of experience in accident reconstruction qualifies him to testify about the presence/absence of skid marks at varying speeds.

"[Seventh Circuit] case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Nelson,* 211 F.3d 1008, 1020 (7th Cir.2000)**.** Plaintiffs' additional criticisms of Goebelbecker's methods are proper subjects for cross-examination. *Walker v. Soo Line R.R.,* 208 F.3d 581, 591 (7th Cir.2000) (indicating that a failure to consider evidence or flaw in the study are appropriate for cross examination).

The same analysis applies to the testimony about fatigue. Goebelbecker, as an expert witness, may base his opinions on inadmissible hearsay evidence, provided

that the evidence is of the type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" Fed.R.Evid. 703. Deposition testimony is a type of data reasonably relied upon by accident reconstructionists, as evidenced by the reports put forth by each expert in this case.

Finally, as to assistance to the trier of fact, the court notes Goebelbecker's scientific methodology discussed above.  With regard to various elements of the accident reconstruction, Goebelbecker does testify to "something more than what is 'obvious to the layperson." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Therefore, his testimony would aid the trier of fact in this case.

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires the proponent of expert testimony to disclose a witness's identity, along with the written report that contains, among other things, a "complete statement of *all* opinions the witness will express and the basis and reasons for them."*Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010)(emphasis added). The penalty for failure to comply with Rule 26 is the "automatic and mandatory" exclusion from trial of the omitted evidence, "unless non-disclosure was justified or harmless." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir.2005) (citation omitted).

In this case, plaintiff seeks to have Goebelbecker's testimony completely barred from this case. Defendants respond arguing that the report contains the substance of all opinions on which Goebelbecker will testify, and that plaintiffs

misconstrued Goebelbecker's explanation. Defendants allege that he "amassed two years' worth of documents and research, which all served as bases for his numerous opinions, which are all summarized within his report." (Doc. 104).

However, the purpose of disclosing the report is "to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) citing *Walsh v. Chez*, 583 F.3d 990, 993 (7th Cir.2009). Therefore, Goebelbecker's testimony will be limited to the opinions expressed in his expert report.

Accordingly, the court finds that Goebelbecker's opinions will assist the trier of fact in understanding the evidence or determining the facts at issue, as required by *Daubert*. Any attack by plaintiffs as to the weight of Goebelbecker's testimony and opinions is a subject appropriate for cross examination. Thus, Goebelbecker's opinions expressed in his report are admissible under Rule 702 and *Daubert.* However, under Fed.R.Civ.P. 26(a)(2), Goebelbecker's testimony must remain within the parameters of the opinions expressed in his expert report.

### 6. Dennis Wylie

Plaintiffs also move to exclude the expert testimony of Dennis Wylie, a human factors expert put forth by the defense who also specializes in the effects of fatigue upon commercial truck drivers (Doc. 91). Specifically, plaintiffs challenge Mr. Wylie's qualifications as an expert to opine as to various matters discussed in his

report. In response, plaintiff cites to Wylie's forty years of experience in the field of human factors and twenty-five years of experience studying and fatigue and its effects on drivers of commercial vehicles. Most relevant to the instant controversy, defendant notes that Wylie's expertise extends to his study of driver fatigue in the trucking field (Doc 103).

Wylie holds a bachelor's degree in physics, in addition to having published multiple studies on fatigue for the Federal Motor Carrier Safety Administration and the Federal Highway Administration (Doc. 103-1). His publications also include an article entitled "Sleep, Science, and Policy Change" published in *The New England Journal of Medicine* and a chapter in the *Handbook of Human Factors in Litigation* (Doc. 103-1). Based on his many years of experience, the court finds that Wylie possesses the requisite "knowledge, skill, experience, training, or education" based on his "full range of practical experience as well as academic or technical training" to qualify as an expert. *Smith*, 215 F.3d at 718.

In addition to Wylie's qualification as an expert, plaintiff argues that Wylie's opinion about Hasib Karahodzic's level of fatigue was based on mere speculation, as he possessed no video recordings of Karahodzic from the night of the accident to assist in his analysis. Defendants refute this argument, however, emphasizing that Wylie relied on the documents, depositions, accident report, and other materials retrieved during the discovery phase to determine that Karahodzic had been on-duty for longer than the allotted hours. Documents show that Wylie utilized Karahodzic's fuel records, and settlement report, which allowed him to

map mileage, fueling times, and routes (Doc. 104-11). Defendant argues that this, coupled with his experience and knowledge about driver fatigue, also helped to form the basis of his opinion.

The Court finds that Wylie's methodology and reasoning are based on sufficient information from the record. Wylie relies on his knowledge of and familiarity with professional practices, custom, and common safety practices in commercial trucking in addition to his scientific experience and peer-reviewed studies on the effects of fatigue on commercial truck drivers. Wylie, as an expert witness, can base his opinions on inadmissible hearsay evidence, provided that the evidence is of the type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject [.]" Fed.R.Evid. 703. As deposition testimony is a type of data reasonably relied upon by experts in Wylie's field when forming opinions or inferences, the court finds Wylie's opinion regarding Karahodzic's level of fatigue is reliable.

Wylie's comparison between levels of fatigue and alcohol intoxication cites to seven different peer-reviewed published studies noting proper methodology and reliability accepted in the field as the basis of such a comparison (Doc. 103-2). This also satisfies the reliability requirement under FRE 702.

Finally, as to assistance to the trier of fact, the court notes the scientific methodology discussed above used in forming Wylie's opinions.  Specifically, with regard to the reconstruction of Karahodzic's routes and his level of fatigue, Wylie does testify to ""something more than what is 'obvious to the layperson.'" *Dhillon*

*v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Therefore, his testimony would aid the trier of fact in this case.

Plaintiffs' concerns regarding Wylie's methods, his failure to account for caffeine, and his conclusions are proper subjects for cross-examination. "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 596.). Thus, Wylie's opinions as to Karahodzic's fatigue are admissible under Rule 702 and *Daubert.*

## IV.   <u>CONCLUSION</u>

Accordingly, the court **GRANTS in part and DENIES in part** the parties motions to exclude testimony. The court **GRANTS** plaintiffs' motion to exclude testimony Dr. Stacey Smith (Doc. 75). The Court **DENIES** plaintiffs' motions to exclude experts John Goebelbecker (Doc. 87), and Dennis Wylie (Doc. 90).

Regarding defendants' motions, the court **DENIES** defendants' motions to exclude Karen Grossman Tabak, Ph.D., C.P.A. (Doc. 77) and Mark Ezra, P.E. (Doc. 84).   However, the court **GRANTS in part** the exclusion of portions of expert reports and testimony of William E. Hampton, Mark Ezra, P.E. and Fred B. Semke, P.E. (Doc. 79).The experts must refrain from opining as to whether

defendant Thompson violated Illinois' statutes 625 ILCS 5/11-905 and 625 ILCS 5/11-606).

**IT IS SO ORDERED.**

Signed this 27th day of April, 2015.

Digitally signed by
David R. Herndon
Date: 2015.04.27
11:08:53 -05'00'

**United States District Judge**