IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

EDIN KARAHODZIC, and )
EDIN KARAHODZIC, as Personal )
Representative of the Estate of )
HASIB KARAHODZIC, )
 )
       Plaintiffs, )    Case No.  3:12-CV-01040-DRH-PMF
 )
vs. )
 )
JBS CARRIERS, INC. and )
ORENTIO THOMPSON, )
 )
       Defendants. )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE

COME NOW Plaintiffs, by and through counsel, and for their Memorandum in Opposition to Defendants' Motions in Limine, state as follows:

### RESPONSE TO DEFENDANTS'FACTUAL BACKGROUND

Plaintiffs must respond to the factual allegations as set forth in the Defendants' aforementioned Motions in Limine, as the factual allegations are, in material respects, incorrect.

Defendants state that "It is generally not disputed that Thompson initiated his four way flashers and pulled his vehicle onto the shoulder of Interstate 70 for the purpose of verifying the operation of running lights on the JBS trailer." Plaintiffs categorically dispute this rendition of facts as it is against any evidence in the record.  Mr. Thompson testified that he used his right hand turn signal (blinker) when he moved from the travel lanes of Interstate 70 to the shoulder. (Exhibit 1, p. 156, lines 22-23; p. 158, line 15 to p.

1

159, line 24.)  Further, Mr. Thompson was not pulling over to "verify the operation of his running lights," he actually saw a malfunctioning light on the left side of his trailer that was blinking when it should not have been. (Exhibit 1, p. 38, line 8 to p. 39, line 7)  Mr. Thompson saw his trailer light in the center of the trailer on the driver's side blinking without his left hand blinker on or his hazard lights on, and pulled onto the shoulder to correct this malfunctioning light. Defendants go on to say that "[Thompson's] four way emergency flashers were illuminated at all times." This is incorrect, and disputed. Mr. Thompson had unplugged the "pigtail" (the electrical connection from the tractor to the trailer), which resulted in all of the lights in the trailer turning off. (Exhibit 1, p. 73, lines 7-22) He also says [I] "Got back in my truck and I cut my four ways off, cut them back on and seen everything was working." (Exhibit 1, p. 74 lines 7-10) The four way flashing lights would have also been off when Mr. Thompson "cut them off" from the cab of his truck.  Plaintiffs dispute that Mr. Thompson could see that the lights on the rear of his trailer were functioning properly while seated in the cab of his tractor.  Furthermore, Mr. Thompson reported that when he plugged the pigtail back into the tractor, he was satisfied that the lights were functioning properly, but he did not do another walk-around of his truck to verify that all of the lights at the rear of the trailer were working properly. (Exhibit 1, p. 74, line 3-10) There is no way of knowing if the four way flashers were working properly.  Defendants' rendition of facts also does not indicate that Mr. Thompson was not using his left hand blinker when changing lanes from the shoulder into the right hand travel lane of Interstate 70. (Exhibit 1, p. 155, line 24 to p. 157, line 3) The Defendants' rendition of facts also leaves out that the minimum speed on this stretch

of interstate was 45 miles per hour and Mr. Thompson was only traveling 15-18 miles per hour in at the time of the collision. (Exhibit 1, p. 87, lines 10-16)

Defendants have either attempted to mislead the Court with respect to the facts of the case, or have ignored the facts of the case in their rendition. In either event, Plaintiffs felt the need to respond with an accurate factual background.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE #1- Exclusion of Post-Accident and Autopsy Photographs of Plaintiffs' Decedent

Defendants have moved for an Order of this Court in Limine barring the admission of Post-Accident and Autopsy Photographs of Plaintiffs' Decedent. Hasib Karahodzic was killed by a blunt force trauma, and his body was severely burned after the accident that is the subject of this case. (Exhibit 3, Death Certificate; Exhibit 4, Autopsy).

Defendants claim that photographs of Hasib's burned body are not relevant, and even if they were relevant, their relevance would not outweigh their prejudicial effect on the jury. However, in the instant case, Edin Karahodzic, the decedent's son, came upon the accident scene shortly after the accident occurred. Edin testified that he could see the flames as he approached the two trucks. (Exhibit 4, p. 174, lines 4-8) Edin tried to put out the fire, and tried to pull Hasib's body from the cab of the truck, because he believed that his father was still alive. (Exhibit 4, p. 175, line 13 to p. 177, line 3) Edin was unable to pull his father from the cab of the truck, and suffered burns to his face, hands, and arms while attempting to rescue his father. (Exhibit 15, p. 7, line 9 to p. 9, line 4) Edin finally abandoned the rescue effort when the heat from the flames became

too intense, and he had to watch his father's body burn in front of him. (Exhibit 4, p. 177, lines 2-3)

Edin Karahodzic has both a claim for the wrongful death of Hasib Karahodzic and a claim for negligent infliction of emotional distress in attempting to rescue his father. Edin was seen by Dr. Edwin Wolfgram, who evaluated Edin psychiatrically following this incident.  Dr. Wolfgram diagnosed Edin with Posttraumatic Stress Disorder, Chronic and Major Depressive Disorder, Single Episode, Severe without psychotic features. (Exhibit 5, p. 4)  Dr. Wolfgram notes that the "Presenting Issue" is that "Edin came upon his father's crash, and was unsuccessful in his efforts to save his father from death.  Edin has developed mental illness as a result of his father's death." (Exhibit 5, p. 1) The Defendants also sent Edin out for a psychiatric evaluation with Dr. Stacey Smith.  Dr. Smith also diagnoses Edin with Post Traumatic Stress Disorder as well as Bereavement. (Exhibit 16, p. 7). She notes that Edin described "witnessing the accident scene as horrific and excruciating." (Exhibit16, p. 4)

The expert psychiatrists in this case both agree that Edin Karahodzic suffered Post Traumatic Stress Disorder as a result of seeing his father's body burn in the crash.  The best evidence of what Edin experienced on March 17, 2012 is depicted in the photographs of his father's burned body.  A jury cannot understand what Edin was forced to watch without the admission of these photos.  No verbal or written description can capture what Dr. Smith describes as a "horrific and excruciating" experience. The probative value of these photographs would outweigh any prejudicial effect on the jury, as the evidence to the jury will be such that Hasib Karahodzic died instantly in the crash,

per the results of the autopsy.  The probative value of the photographs goes to the mental illness (PTSD) that Edin has suffered as a result of seeing the fiery crash scene and attempted rescue of his father.

"The fact to which the evidence is directed need not be in dispute." *FRE 401* Advisory notes; *U.S. v. Fields,* 483 F.3d 313 (5th Cir. 2007) (citing *U.S. v. Hall*, 152 F.3d 381, 401(C.A. 5 (Tex.) 1998). Furthermore, "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits the exclusion of relevant evidence under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing." *Hall*  at 401.  *Hall* and *Fields*  were both criminal cases where victims were killed, and the Court, in each case, allowed photographs of the deceased victims into evidence.

Additionally, "to substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight." *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 653,136 L.Ed.2d 574 (1997).  In this case, the Defendants argue that the photographs are too prejudicial and gruesome to show to the jury, but they will not argue that verbal descriptions of the body cannot be given.  That is exactly the attempt to "rob the evidence of its fair and legitimate weight" discussed in the *Old Chief* case.  A picture is worth thousand words, and in this case it cannot be more correct.  The photographs of what Edin had to endure in watching his father's body burn as it relates to his PTSD, emotional distress, grief, sorrow, and mental anguish, are

clearly relevant to the cause of his mental illness, are more probative than prejudicial, and should be admitted.

WHEREFORE, Defendants' Motion in Limine #1 should be denied.

## RESPONSE TO DEFENDANTS'MOTION IN LIMINE #2- Legal Conclusions about Thompson's Operation of his Vehicle at the Time of the Accident

Defendants have moved for an Order of this Court in Limine barring the admission of legal conclusions about Orentio Thompson's operation of his vehicle at the time of the accident. As noted by the Defendants, the court has already sustained an Order prohibiting Plaintiffs' experts from testifying specifically that Mr. Thompson violated specific Illinois statutes regarding minimum speed and use of blinkers. (See Court Memorandum and Order, Document 106, p. 15) Now, Defendants are, under the auspices of the same argument, trying to exclude any fact that Mr. Thompson did anything incorrectly when he entered to highway from the emergency lane going 15-18 miles per hour without the use of his left hand blinker.

Mr. Thompson testified that he started from a stop on the shoulder of the interstate past the Exit 68 sign, and had his "four ways" on, without using his left hand blinker. (Exhibit 1, p. 70, lines 6-11; Exhibit 1, p. 156, line 20 to p. 157, line 3) The Defendants now try to use the "back door" argument to exclude facts about the case at trial because such facts may indicate that Mr. Thompson did, indeed, violate Illinois laws. This can be accomplished without the mention that Mr. Thompson violated an Illinois Statute. Plaintiffs' experts will give a number of opinions that do not indicate that Mr. Thompson expressly "violated an Illinois Statute," but certainly indicate that he should not have

6

engaged in the actions that violated the statute. (Exhibit 6, p. 8, Exhibit 7, p. 7, Exhibit 8, p. 8 and p. 12)  Under the logic advanced by Defendants, the Court should prohibit any evidence of Mr. Thompson telling the jury what he did when changing lanes from the shoulder back onto the interstate.  That is ridiculous.

Furthermore, the Defendants seem to indicate that Rule 702 would somehow prohibit Plaintiffs' experts from talking about what Mr. Thompson's actions should have been. It requires no "scientific, technical, or specialized knowledge" within the meaning of Rule 702 for Mr. Thompson to explain his slow speed and his failure to use a left hand blinker when changing lanes from the shoulder to the right hand travel lane.

Finally, the Defendants' argue that any evidence of Mr. Thompson's actions that violate Illinois Statutes should be barred because Plaintiffs' did not plead negligence per se in their Complaint.  Defendants have forgotten that we are in Federal Court, where notice pleading is all that is required in a complaint. *FRCP* 8(a)(2).  Plaintiffs are not required to plead negligence per se in Federal Court, and the Defendants' argument is not well-taken.

WHEREFORE, Defendants' Motion in Limine #2 should be denied.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE #3- Evidence Regarding any Medications Identified in Thompson's Lab Reports

Defendants have moved for an Order of this Court in Limine barring any evidence regarding medications identified in Orentio Thompson's lab report. This is undoubtedly because they are concerned that Mr. Thompson's positive test for opiates might be create an inference that he was under the influence of powerful, prohibited drugs at the time of

the accident. While it is true that he was administered morphine shortly before the drug test was taken, it cannot be held against Plaintiffs that the medical staff did not follow procedure. Inference can be made that Mr. Thompson may indeed have been under the influence of opiates at the time of the accident, even though he was given morphine before his testing. Thompson's failure to look (or see) Hasib Karahodzic's truck, failure to use his left hand blinker when changing lanes from the shoulder to the right hand travel lane, and entering the interstate highway at a dangerously slow speed of 15-18 miles per hour could all be attributed to the influence of opiates.

Additionally, some of Mr. Thompson's medical records indicate that Mr. Thompson's receipt of morphine may have caused him to give an inaccurate account of the accident to the police, by his own account. (Exhibit 1, p. 107, lines 6-12 and p.118, lines 2-8); (Exhibit 9, Records from Fayette County Hospital, and Exhibit 10, Records from Dr. Gregory Thwaites (to be shown in camera to the Court)).  The administration and influence of morphine to Mr. Thompson is clearly relevant, in that many of the post-accident statements given by Mr. Thompson, in medical records, and in writing in the police report, may have been inaccurate as a result of Mr. Thompson being under the influence of morphine.  Mr. Thompson's deposition testimony also confirms the effect morphine had on him in his post-accident statements, in that he indicates his statements to the police were probably incorrect as a result of the morphine given him post-accident. (Exhibit 1, p. 107 lines 6-12; Exhibit 1, p. 118, lines 2-18)

Defendants indicate that the evidence is clear that Mr. Thompson was not under the influence of morphine at the time of the accident.  However, it is impossible to know

whether or not Mr. Thompson had morphine or other opiates in his system prior to the accident, only because the medical staff at Fayette Hospital administered morphine BEFORE giving Mr. Thompson his drug test. In any event, the positive test for morphine is relevant to the issue of the accuracy of Mr. Thompson's statements in his medical records and to the Illinois State Police after the accident, and should be admitted.

WHEREFORE, Defendants' Motion in Limine # 3 should be denied.

### RESPONSE TO DEFENDANTS' MOTION IN LIMINE # 4- Evidence Regarding JBS' Accident Review Committee

Defendants have moved for an Order of this Court in Limine barring any evidence regarding JBS' Accident Review Committee.  In support of their Motion, Defendants cite to *Thompson v. City of Chicago*, 472 F.3d 444,446 (7th Cir. 2006), *Whren v. U.S.,* 517 U.S 806, 815, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996), and *Tyson v. Old Dominion Freight Line, Inc.,* 270 Ga. App. 897, 608 S.E.2d 266 (2004).

In *Thompson,* the Court excluded the Chicago Police Department's General Orders, practices, and policies from a trial where the plaintiffs' decedent died of asphyxia from a policeman's choke hold after leading police on a high speed automobile chase. *Thompson* at 446.  In *Whren*, the analysis was of a traffic stop, with facts that are not at all similar to this case, in that the Court reviewed the "reasonableness" of the traffic stop, affirming the stop itself and the detention of the driver because the driver had violated traffic laws. The facts and analysis of *Whren* are inapplicable to this case. Finally, the Defendants cite to a Georgia State Appellate Court case, *Tyson*, where, after a trial, the Appellate Court reversed and remanded the judgment in favor of the defendant trucking

company. The Court in *Tyson* held that the trial court improperly held that the Report of the Defendant trucking company's Accident Review Committee was not discoverable. *Tyson* at 608 S.E.2d 269. The Appellate Court went on to say that the Trial Court properly kept the Accident Review Committee's finding that the accident itself was preventable because the standard for the Accident Review Committee was different than the standard of liability. *Id.* This is totally inapplicable to the case at bar, as the JBS Accident Review Committee did not convene at all with regard to Mr. Thompson's accident. (Exhibit 11, p. 105, line 24 to p. 107, line 22).

In this case, JBS has failed to follow its own internal procedures referable to convening the Accident Review Committee to review this accident. As noted above from Mr. Kopecky's deposition, JBS made no determination as to whether the accident was preventable, and had no meeting of the Accident Review Committee to even review Mr. Thompson's accident. The argument that this is a subsequent remedial measure is a red herring in this case, as no subsequent remedial measures were taken, and JBS did not convene their Accident Review Committee in contravention of their own internal procedures. "The mission of the Accident Review Committee (ARC) will be: 1) To review **each** accident involving a JBS Carriers' driver to determine whether or not the accident was preventable…" (emphasis added)(Exhibit 12) These rules differ significantly from the testimony of Mr. Kopecky, in that every accident should be reviewed according to JBS' internal rules. (Exhibit 11, p. 106, lines 4-19) The policies regarding the Accident Review Committee meetings are essentially a sham, because, per Mr. Kopecky's admission, all drivers who make workers' compensation claims and are

10

paid a workers'compensation indemnity are also always given compensation to "mutually agree" to part ways with JBS. In that instance, any driver that is involved in an accident and receives an indemnity from a workers' compensation claim would never be required to undergo Accident Review Committee scrutiny, because they would no longer be employed at JBS.  The JBS policies regarding settlement with workers' compensation claimants to leave JBS' employ allow JBS to skirt around its own safety protocols.

The fact that no action whatsoever was taken by the Accident Review Committee in this case is relevant, because it shows that JBS contravenes its own safety rules regarding the "Safe Driving Program" as it sees fit, and especially when it appears that the accident would have been deemed preventable.  The failure to convene the Accident Review Committee shows that JBS is not at all concerned about improving safety, and more concerned about potential legal and evidentiary pitfalls by convening the Accident Review Committee instead of determining ways to make the fleet safer.

WHEREFORE, Defendants' Motion in Limine #4 should be denied.

### <u>RESPONSE TO DEFENDANTS'MOTION IN LIMINE #5-Evidence Regarding Thompson's Workers' Compensation Claim and its Resolution</u>

Defendants have moved for an Order of this Court in Limine barring any evidence regarding Mr. Thompson's Workers' Compensation Claim and its resolution. Mr. Thompson's workers' compensation claim and the records therefrom were brought up in JBS Carriers' initial complaint against Hasib Karahodzic's Estate and EJA Trucking. Absent JBS making the workers' compensation claim an issue in this litigation, it would not otherwise be an issue.  This, again, is a tactical consideration that should have been

made by JBS prior to filing this litigation, and making Mr. Thompson's workers'

compensation claim an issue.  However, JBS has produced a good number of Mr.

Thompson's medical records that all relate to his workers' compensation claim, and

contain relevant and material statements from Mr. Thompson as to how the accident

happened. Plaintiffs believe that Defendants are now trying to exclude reference to these

very relevant records by indicating that they reference the workers' compensation claim,

and should therefore, be barred. The records themselves are very relevant, and a jury will

undoubtedly understand that these stem from a workers' compensation claim.

The General Release as to the Workers' Compensation claim and Release of all

claims is relevant, because Mr. Thompson indicated in his deposition that his

understanding of his workers' compensation settlement was that he received $18,500.00

for the work injury.  (Exhibit 1, p. 138, line 7 to p. 139, line 25) He denied knowing

anything about a general release of any claims against JBS Carriers for $500.00.

Apparently, Mr. Thompson was misled when signing the settlement documents with JBS

Carriers as to exactly what he was signing.

In addition, whether Mr. Thompson had found other employment closer to home

or not, Mr. Kopecky, the JBS Corporate Designee, testified that if a workers'

compensation indemnity payment is made, then JBS, as a matter of policy, "settles" with

those workers to mutually part ways.  (Exhibit 11, p. 181, lines 3-20) In accordance with

JBS' policy, Mr. Thompson could not have worked there again even if he wanted to. JBS

essentially sweetens the indemnity (in this case with $500.00) for the employee to sign a

General Release and claim that they have voluntarily quit. This is relevant because if all

drivers that make workers' compensation claims pursuant to an accident, receive an indemnity, and "mutually agree" to part ways, then no accident reviews are necessary for such accidents.  According to Mr. Kopecky, the Accident Review Committee was only required to meet and make a determination as to preventability of an accident before a driver continues to drive. (Exhibit 11, p. 106, lines 4-19) So, if a driver gets in an accident, make a workers' compensation claim, and is paid an indemnity, that driver will never be employed at JBS Carriers, Inc. as a matter of policy because they are always paid to "mutually agree" to leave as part of the workers' compensation settlement, then the Accident Review Committee would never be required to meet about such accidents, according to Mr. Kopecky.

Finally, the argument that a jury "could" believe that JBS terminated Mr. Thompson as a result of the accident and settling his claim is wholly rebutted by the terms of the General Release and Mr. Thompson's own testimony, discussed above, that he voluntarily quit JBS to drive closer to home.

WHEREFORE, Defendants' Motion in Limine #5 should be denied.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE # 6- Evidence Regarding Audits of JBS and the Federal Motor Carrier Administration's JBS SAFER Profile or Other Similar Documents Assessing JBS' Operation

Defendants have moved for an Order of this Court in Limine barring any evidence of regarding audits of JBS and the Federal Motor Carrier Administration's JBS SAFER Profile or other similar documents. Defendants only cite *FRE 401and 403* in support of the contention that this information is not relevant.

The information that the Defendants seek to exclude is relevant under Federal Rule of Evidence 406, relating to the routine practice of JBS Carriers, Inc. JBS Carriers, Inc. was cited by the Federal Motor Carrier Safety Administration for numerous log violations (102) and allowing three drivers with suspended, revoked, or canceled CDL's to drive. (Exhibit 18) As a result of that investigation, JBS Carriers, Inc., as part of a settlement agreement with FMCSA, installed electronic on board recorders on all of its trucks. It had been the routine practice of JBS Carriers, Inc. to turn a blind eye to log violations and allowing drivers who were suspended and revoked to drive until November of 2010. (Exhibit 18) The SAFER profile deals with JBS' rate of compliance on a number of different performance measurement scales. (Exhibit 19)

In the case at bar, Mr. Thompson, the JBS driver involved in the accident that is the subject of this litigation, had an electronic on board recorder installed in his truck can to log his driving hours.  JBS' Safety Director, Randy Kopecky, indicated that all of the drivers for JBS went through a minimum of two days of training before they were allowed to drive. (Exhibit 11, p. 67, lines 1-18) This orientation and training "cover[s] all aspects of the business, safe operations, safe use of Federal Motor Carrier required things, including log books and equipment." (Id.)

Mr. Thompson's testimony at his deposition and review of his electronic log printouts made it clear that immediately before the accident on March 17, 2012, he had improperly logged his time into the electronic log, in spite of his training with JBS. Mr. Thompson testified that when he got out of his truck to check the trailer lights in the minutes before the accident, he logged "off duty" into the electronic log. (Exhibit 1, p.

14

129, lines 2-6; Exhibit 17) Mr. Thompson indicated that his understanding was that he could put "off duty" or "on duty" into the machine, and either would be correct. (Exhibit 1, p. 129, lines 7-14)

Furthermore, Mr. Thompson, in trying to explain why he did not use his left hand blinker when coming back onto the road from the shoulder, indicated that he understood that he could use his four-way flashing lights to get back onto the road depending on the situation, and that nighttime was one of those situations. (Exhibit 1, p. 158, lines 1-10) If Mr. Thompson's training at JBS Carriers, Inc. was such to indicate that his maneuver and failure to use a left hand blinker when entering the roadway from the shoulder was appropriate, that is clear evidence of negligent training, and is highly relevant. None of the CDL driver training manuals indicate that such a maneuver is appropriate. Given JBS' habitual practice from less than two years prior of turning a blind eye to violations, this is very relevant to the case.

WHEREFORE, Defendants' Motion in Limine #6 should be denied.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE # 7- Claims Not Included in the Pleadings

Defendants have moved for an Order of this Court in Limine barring any claims not included in the pleadings. Defendants go on to cite, in part, Federal Rule of Civil Procedure 8(a), indicating that Plaintiffs are required to make ä short and plain statement of the claim showing that the pleader is entitled to relief." The Defendants then go on to cite a case that has apparently been overruled and negatively treated, *Ricciuti v. N.Y.C.*

*Transit Authority,* 941 F.2d 119, 123 (2d Cir. 1991)(See *Mahar v. U.S. Express Enters., Inc.,* 688 F.Supp. 2d 95, 117 (footnote 6) (N.D.N.Y., 2010).

In *Ricciuti*, the plaintiffs filed a claim for relief under 42 U.S.C. § 1983. Their claim made reference to certain evidence, and was dismissed by the District Judge for failure to state a claim. *Ricciuti* at 120. The District Judge also refused to consider a proffered amended pleading in dismissing plaintiffs' case. *Id.* The 2nd Circuit Court of Appeals reversed the District Judge's dismissal of plaintiffs' case, noting that "[u]nder Rule 8(a), a plaintiff is not required to prove his case at the pleading stage." *Id* at 123-124.

Not only did Defendants cite to bad law in support of their contentions, they have again forgotten, as mentioned in Plaintiffs' response to Defendants' Motion in Limine #2, that Federal Courts only require notice pleading, not fact pleading. *FRCP* 8(a). Plaintiffs should be allowed to advance any theory supported by the evidence, as the Court and Rules of Civil Procedure do not require fact pleading.

WHEREFORE, Defendants' Motion in Limine #7 should be denied.

### RESPONSE TO DEFENDANTS' MOTION IN LIMINE #8- Evidence of Edina Karahodzic's Alleged Depression or Suicide Attempt

Defendants have moved for an Order of this Court in Limine barring Plaintiffs from introducing evidence of Edina Karahodzic's Depression or Suicide Attempt. In support of their Motion, the Defendants cite *Villalba v. Consol. Freightways Corp. of Delaware,* 98 C 5347, 2000 WL 1154073, at *4 (N.D. Ill. Aug. 14, 2000) (quoting *Franklin v. Shelton,* 250 F.2d 92, 97 (10th Cir. 1957)) (citing *Walker v. Shansky,*

28 F.3d 666, 672 (7th Cir. 1994)(holding plaintiff not qualified to testify as to his mental condition)).

The plaintiff in *Villalba* had been involved in an automobile accident on August 4, 1996, and attempted suicide on August 27, 1997. *Villalba* at p.12.  In addition, it appears that the plaintiff in *Villalba* had a suicide attempt in 1990, prior to the accident. It is easily understood that the Court in *Villalba* required expert testimony regarding psychiatric injuries claimed after plaintiff suffered physical injuries in an auto accident.

The facts regarding Edina Karahodzic's depression and suicide attempt are very different.  Edina testified that one year after her father's death she was having nightmares about her father's burnt body, constantly seeing (in her nightmares) how his body looked. (Exhibit 13, p. 56, line 22 to p. 57, line 3.) She testified that she went to Hasib's grave site and took 20-30 over the counter sleeping pills in a suicide attempt because she "didn't want to feel like that anymore." (Exhibit13, p. 57 to p. 58, all lines) Edina had seen her father's remains after his death at the funeral home. (Exhibit 13, p. 57, lines 4-13) In this instance, it does not require expert testimony to come to the conclusion that Edina's nightmares about her father's burnt body and subsequent suicide attempt on or about the one year anniversary of Hasib's death at the cemetery where he is buried would require expert testimony to prove any nexus.

This issue goes to Edina Karahodzic's damages as they stem from her claim pursuant to the Illinois Wrongful Death Act, *740 ILCS 180/2*. As this case is a diversity jurisdiction case, based on the Illinois Wrongful Death Act regarding the issue of Edina's

damages (specifically regarding her, grief, sorrow and mental suffering) for the loss of her father, Hasib, Illinois law should apply, as this is a substantive issue.

Illinois cases have allowed plaintiffs to give lay testimony regarding emotional injuries. *Thornton v. Garcini,* 237 Ill. 2d 100, 928 N.E.2d 804, 340 Ill. Dec. 557 (Ill. 2010)  In *Thornton,* the Illinois Supreme Court opined that lay testimony regarding the emotional distress suffered by the plaintiff when her infant child died and was left partially delivered for over an hour. *Thornton*  at 807.  The Illinois Supreme Court went on to opine that "the existence or non-existence of medical testimony goes to the weight of the evidence but does not prevent this issue from being submitted to the jury." *Thornton*  at 809 (citing *Clark v. Owens-Brockway Glass Container, Inc.*, 297 Ill. App. 3d 694, 701, 232 Ill. Dec. 1, 697 N.E.2d 743 (1998)).

Illinois courts have also allowed people to give lay testimony as to their own psychological trauma, without the assistance of expert testimony. *People v. Hudson,* 228 Ill.2d 181, 319 Ill.Dec 840, 886 N.E.2d 964 (2008).  In *Hudson,* a trial court allowed a 16-year-old home invasion victim to testify about the psychological injuries she suffered as a result of the home invasion. The Illinois Supreme Court in *Hudson* held that the "jurors could reasonably find, without the assistance of expert testimony, that the circumstances of the offense were such as to cause psychological injury to a 16-year-old girl." *Hudson* at 975.

Similarly, in Edina Karahodzic's case, the facts surrounding her depression and suicide attempt clearly indicate that her depressed mood, suicidal thoughts, and attempt at suicide stem from her father's death and her repeated nightmares of seeing his burnt

body.  Like *Hudson*, the circumstances of this case are such as to cause Edina's depression and a suicide attempt.  The fact that it was on or near the one year anniversary of Hasib's death and the fact that she went to Hasib's grave site in the cemetery when she attempted suicide are clear indications that her psychiatric issues stem from her father's death and seeing his burned body.

Edina did not offer an opinion in a clinical sense as to her depression, but, merely that she felt depressed as a result of her father's death.  This lay testimony should be allowed, and, if anything, the absence of any expert testimony regarding her depression and suicide attempt should go to the weight of the evidence.

WHEREFORE, the evidence of Edina Karahodzic's depression and suicide attempt should be allowed, and Defendants' Motion in Limine #8 should be denied.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE #9- Evidence of Defendant's Size, Wealth, or Corporate Status

Defendants have moved for an Order of this Court in Limine to bar any evidence of JBS Carriers, Inc.'s size, wealth, or corporate status. In support of the Motion, Defendants cite to *Burke v. Deere & Co.,* 6 F.3d 497, 513(8th Cir. 1993).  In that case, the Court found that the Plaintiff's submission of a punitive damage argument to the jury was inappropriate. All of the cases cited in *Burke* disallow evidence of the Defendant's wealth and net worth in a compensatory damages case.  Neither *Burke*, nor any of the cases cited therein, speak to the issue of the size of the Defendant's company or the corporate status of the Defendant.

First, the Defendant JBS' attempt to hide that it is a corporation is duplicitous. All of the pleadings contain "JBS Carriers, Inc." as a party to this litigation. Defendants cite no law, and cannot identify any prejudicial effect of calling the corporation exactly what it is, a corporation. Defendant JBS Carriers, Inc. cannot hide its name from the jury.

Additionally, the size of JBS Carriers, Inc. is relevant in many respects to this case. JBS Carriers, Inc. has a large corporation that has administrative staff that controls hiring of drivers, training of drivers, driver locations, logs, accident reporting, and many other aspects of the operation of a large trucking corporation. It is also relevant to the safety measures it has in place and allegedly (as discussed in the point on the Accident Review Committee) has rules to monitor its drivers after accidents to improve safety. Mr. Thompson's testimony about how he entered his electronic logs improperly just minutes before the March 17, 2015 accident (he entered "off duty" when he should have entered " on duty, not driving") are relevant to the size of JBS Carriers, Inc. (Exhibit 1, p. 129, lines 2-14; Exhibit 17) It is clear from this testimony that JBS Carriers, Inc. did not properly train Mr. Thompson on how to use the electronic log book.

Plaintiffs will concede that they will not discuss the net value or wealth of JBS Carriers, Inc., however, the corporate status of JBS Carriers, Inc. and its size are clearly relevant to this case, and the introduction of evidence as to JBS Carriers, Inc.'s size and the fact that they are a corporation should be allowed.

WHEREFORE, Plaintiffs pray that Defendants' Motion in Limine # 9 be denied as to corporate status and size as described above.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE #10- Traffic Citation Issued to Thompson and Dismissed by the State's Attorney's Office

No response.

## RESPONSE TO DEFENDANTS' MOTION IN LIMINE #11- Initial Claim Brought by JBS  Against Decedent's Estate and EJA Trucking and Subsequent Settlement

Defendants have moved for an Order of this Court in Limine to bar any mention of the initial claim brought by JBS against the decedent's estate and EJA Trucking and any subsequent settlement. While Plaintiffs agree that the settlement and terms of said settlement should not be mentioned to the jury, they disagree that any mention of the initial claim brought by JBS against Edin Karahodzic as personal representative of the Estate of Hasib Karahodzic and EJA Trucking should be barred.

Plaintiffs have an unsigned copy of the Settlement Agreement between JBS Carriers, Inc. and EJA Trucking.  Plaintiffs believe that this is the final version of the Settlement Agreement between those parties and decedent's estate, lacking the signatures of the attorneys and parties thereto.  (Exhibit14, (Settlement Agreement to be produced in camera to the Court))

The Plaintiffs do not believe that a reasonable reading of the Settlement Agreement would prohibit any of them from discussing or mentioning that JBS was a plaintiff and filed the lawsuit against EJA Trucking and Edin Karahodzic as personal representative.  JBS has threatened, in its Motion in Limine #11, to disclose the terms of the settlement if Plaintiffs mention that JBS was initially the plaintiff in this litigation. By disclosing the terms of the settlement, JBS would open itself up to civil liability for

breaching the Confidentiality Clause of the Settlement Agreement, as such disclosure is only allowed if ordered by a Court.

Furthermore, JBS had a strategic decision to make when filing this lawsuit. By initiating this litigation, all of the initial pleadings, discovery, and mention of the now-Plaintiffs, referred to them as "Defendants". To prohibit or attempt to prohibit mention or showing of documentation that JBS was initially the Plaintiff would be difficult, if not impossible. Additionally, there was no guarantee that JBS was going to settle the claims against EJA Trucking and the Estate, in which case they would still remain as a plaintiff. The way for JBS not to be referred to as a plaintiff would have been not to bring the lawsuit. Strategic choices have consequences, and JBS now tries to "unring the bell" by filing this motion. If JBS was afraid of being prejudiced by being referred to as a plaintiff, that consideration should have been made prior to filing the lawsuit against EJA and Hasib Karahodzic's Estate.

WHEREFORE, Defendant's Motion in Limine #11 should be denied with respect to the initial claim brought against decedent's estate and EJA.

## CONCLUSION

WHEREFORE, Plaintiffs pray that this Court deny the Defendants' Motions in Limine as stated above.

22

Respectfully Submitted,

/s/ Frank J. Niesen, III
Frank J. Niesen, III, 498806
Security Building
319 N. 4th Street – Suite 200
St. Louis, MO  63102
(314) 421-5800
(314) 421-5804 Fax
Attorney for Plaintiffs Edin Karahodzic,
and Edin Karahodzic as Personal
Representative of the Estate of Hasib
Karahodzic

Certificate of Service

A copy of the foregoing was served via the court's electronic filing service and U.S. Mail, postage prepaid this 1st day of September, 2015 to:

William C. Brittan, Esq.
Attorney for JBS Carriers, Inc. and Orentio Thompson
270 Saint Paul Street – Suite 200
Denver, CO  80206
bbrittan@ckbrlaw.com

and

John S. McCollough, Esq.
714 Locust Street
St. Louis, MO  63101
Attorney for JBS Carriers, Inc. and Orentio Thompson
jmccollough@lashlybaer.com

/s/ Frank J. Niesen,III